COLIN MITCHEL AND OTHERS, APPELLANTS, *v.* THE UNITED STATES, APPELLEES.

Construction of the decree and mandate of the Supreme Court, at January term, 1835, in the case of Colin Mitchel *v.* The United States; reported in 9 Peters, 711.

A claim to the land, up to the walls of the fort of St. Marks, in Florida, and to the land covered by the fort, rejected.

The Superior Court of Middle Florida, having, in obedience to the mandate of the Court, proceeded to make the inquiries directed thereby, decided that the extent of lands adjacent to forts in Florida, where such were usually attached to such forts, was determined by a radius of fifteen hundred Castilian varas for the salient angles of the covered way, all around the walls; and on there being no covered way, from the extreme line of the ditch. The Superior Court decreed the extent of the land reserved for the United States, round the fort of St. Marks, in conformity with this opinion. The decree was confirmed, on the appeal of the claimants.

The case of Sibbald, 12 Peters, 493, and the case in 10 Wheaton, 431; cited; and the principles decided and applied, in reference to the construction and execution of the mandate of the Supreme Court, affirmed. "To ascertain the true intention of the decree and mandate of this Court, the decree of the Court below, and of this Court, must be taken into consideration." "The proceedings in the original suit, are always before the Court, so far as to determine any new points between the parties."

According to the principles settled by the Supreme Court, in numerous cases arising on grants, by North Carolina and Georgia, extending partly over the Indian boundary, the grant is good, so far as it interfered with no prior right of others as to whatever land was within the line established between the State and the Indian territory. Danforth *v.* Wear, 9 Wheat. 673. Patterson *v.* Jenckes, 2 Peters, 216, cited.

ON appeal from the Superior Court of the Middle District of Florida.

In the Supreme Court, at January term, 1835, 9 Peters, 711, the case of Colin Mitchel, and others, appellants, against the United States, was argued and determined; on an appeal from the Superior Court of East Florida.

It was a claim to lands in East Florida, the title to which was derived from grants from the Creek and Seminole Indians, ratified by the authorities of Spain, before the cession of Florida to the United States. The claim was confirmed by the Court, with the exception of so much of the tract conveyed between the rivers Wakulla and St. Marks, conveyed to John Forbes and.

Company, in 1811, as includes the fortress of St. Marks, and the territory directly and immediately adjacent and appurtenant thereto; which was reserved to the United States.

On the 30th day of January, 1836, Colin Mitchel, and others, the appellants in the Supreme Court, filed in the Superior Court of Middle Florida, the decree and mandate of the Supreme Court, as follows:

"This cause came on to be heard on the transcript of the record from the Superior Court for the middle district of Florida, and was argued by counsel; on full consideration whereof, this Court is unanimously of opinion, that the title of the petitioners to so much of the lands in controversy, as is embraced within the lines and boundaries of the tract granted by the deeds, grants, and acts of confirmation to Panton, Leslie & Co., in 1804 and 1806; also to the island in the river Appalachicola, ceded, granted, and confirmed to John Forbes, in 1811; also the lands and islands at and west of the mouth of said river, which were ceded, granted, and confirmed to John Forbes & Co., in 1811, is valid by the law of nations, the treaty between the United States and Spain, by which the territory of the Floridas were ceded to the former, the laws and ordinances of Spain, under whose government the title originated, the proceedings under said treaty and the acts of Congress relating thereto; and do finally order, decree, and determine, and adjudge accordingly. And this Court doth in like manner order, adjudge, determine, and decree, that the title of the petitioner to so much of the tract of land which lies east of the first mentioned tract between the rivers Wakulla and St. Marks, which was conveyed to John Forbes & Co., in 1811, as shall not be included in the exception hereinafter made, is valid by the laws, treaty, and proceedings as aforesaid; with the exception of so much of the last mentioned tract as includes the fortress of St. Marks, and the territory directly and immediately adjacent and appurtenant thereto, which are hereby reserved for the use of the United States. And it is further ordered and decreed, that the territory thus described, shall be that which was ceded by the Indian proprietors to the crown of Spain, for the purpose of erecting the said fort, provided the boundaries of the said cession can be ascertained. If the bound-

E 2

aries of the said cession cannot now be ascertained, then the adjacent lands which were considered and held by the Spanish government, or the commandant of the post as annexed to the fortress for military purposes, shall be still considered as annexed to it, and reserved with it for the use of the United States. If no evidence can now be obtained to designate the extent of the adjacent lands, which were considered as annexed to St. Marks as aforesaid; then so much land shall be comprehended in this exception as, according to military usage, was attached generally to forts in Florida, or the adjacent colonies. If no such military usage can be proved, then it is ordered and decreed, that a line shall be extended from the point of junction between the rivers St. Marks, and Wakulla, to the middle of the river St. Marks, below the junction, thence extending up the middle of each river three miles in a direct line, without computing the courses thereof; and that the territory comprehended within a direct line, to be run so as to connect the points of termination on each river, at the end of the said three miles up each river; and the two lines to be run as aforesaid, shall be, and the same are hereby declared to be the territory reserved as adjacent and appurtenant to the fortress of St. Marks, and as such reserved for the use of the United States. To which the claim of the petitioner is rejected; and as to w ich, this Court decree that the same is a part of the public lands of the United States.

The decree of the Court below is therefore reversed and annulled in all matters and things therein contained, with the exception aforesaid; and this Court, proceeding to render such decree as said Court ought to have rendered, do order, adjudge, and decree that the claim of the petitioner is valid, and ought to be confirmed, and is, and remains confirmed by the treaty, laws, and proceedings aforesaid, to all the lands embraced therein, except such part as is herein above excepted. And this Court does further order, adjudge, and decree, that the clerk of this Court certify the same to the surveyor-general of Florida, pursuant to law, with directions to survey, and lay off the land described in the petition of the claimants, according to the lines, boundaries, and description thereof in the several deeds of cession, grant, and confirmation by the Indians, or governor of West Florida, filed as exhibits in this cause, or referred to in the

record thereof, excepting, nevertheless, such part of the tract granted in 1811, lying east of the tract granted in 1804, and 1806, as is hereby declared to be the territory of the United States, pursuant to the exception hereinbefore mentioned; and to make return thereof according to law, as to all the lands comprehended in the three first herein mentioned tracts. And as to the tract last herein mentioned, to survey in like manner, lay off the same, so soon as the extent of land herein excepted and reserved for the use of the United States, shall be ascertained in the manner hereinbefore directed.

And this Court doth further order, adjudge, and direct, that the extent and boundaries of the land thus excepted and reserved, shall be ascertained and determined by the Superior Court of the middle district of Florida, in such manner, and by such process as is prescribed by the acts of Congress relating to the claims of lands in Florida, and to render thereupon such judgment or decree, as to law shall appertain."

Subsequently, Colin Mitchel and others filed a bill in the said Court, wherein they claimed the lands to the walls of the fort of St. Marks, on all sides; and prayed confirmation thereof to the said walls of the fort as aforesaid, to be held, as it was, under the dominion of Spain, according to the treaty of cession, and the proceedings under it in other cases.

On the 14th of February, 1838, they filed an amended petition in the same Court, in which they assert the fee in the land on which the fort of St. Marks is erected, to have been and now to be in themselves, whilst they admit the right of the government of the United States, for the purposes of a fort; and they, therefore, prayed that the fee of the land covered by the fort, as well as that adjoining and appurtenant, should be decreed to them, whilst the use thereof, for the purposes of a fort, might be reserved, by a decree of that Court to the government of the United States.

On the 14th of February, 1838, the attorney of the United States, for the district of Middle Florida, filed his answer to the bill and amended petition; in which, although he denied the facts and allegations therein set forth, he alleged, on the part of the United States, that the matters which were to be ascertained and decided by the Court, did not arise out of said petition, and amended petition, and that it should not be governed or regulated

in the investigations to be made thereby; that the power and authority of the Court to hold cognisance of the case, after their former final decree therein, was not in anywise founded upon the filing of said petition, but entirely and exclusively derived from, and founded upon the decree of the Supreme Court of the United States, at January term, 1835; by and in which the Court were directed to ascertain certain questions of fact; and the said petition and amended petition being, therefore, supererogatory, it was not necessary for the said United States of America to finally answer the same, or create any issues of law or fact thereupon.

The attorney of the United States, therefore, prayed that the said petition and amended petition might be dismissed; and that the Court would proceed to decide the questions referred to it by the Supreme Court, according to, and in pursuance of, the four alternative rules prescribed in the same, without reference to the petition and amended petition.

On the 30th of June, 1838, the Superior Court for the middle district of Florida, decreed, on the proofs taken, and after argument, that the boundaries of the territory, ceded by the Indians to Spain, for the purpose of erecting the fortress of St. Marks, cannot now be ascertained; that no evidence can now be obtained to designate the extent of the adjacent lands, which were considered as annexed to said fortress, by the crown of Spain, or the commandant of said post. But that there is sufficient evidence of the military usage of Spain to determine the extent of land adjacent to forts in Florida, which were usually attached to said forts; that the extent of such reservations was determined by a radius of fifteen hundred Castilian varas from the salient angles of the covered way, all round the works, or, there being no covered way, from the salient angles of the exterior line of the ditch.

The Court, therefore, decreed, that the lands adjacent to the fortress of St. Marks, to be reserved to the use of the United States, and as part of the public land of the same, shall be ascertained, described, and determined, as follows, viz., from the eastern point of that part of the exterior line of the ditch which is in advance of, and parallel with, the northern face of the bastion, and opposite the shoulder of the same, a line will be drawn, at right angles with that face of the bastion, fifteen hundred

Castilian varas from the same point of beginning; two other lines, of fifteen hundred varas in length, will be drawn and extended to points on the margin of the two rivers, St. Marks and Wakulla, respectively; from the central one of these three points, lines shall be extended, connecting the terminations of these three radii; and thence, extending in the same lines, to the centre of the two rivers, St. Marks and Wakulla; and all the land comprehended within these lines, and the middle of each river, from their termination to the confluence of the two rivers below the fort of St. Marks, shall be the land reserved to the use of the United States. The "vara" to be used in this survey to be the "Castilian," or "judicial vara of Spain," five thousand of which make a league, and are equal in length to four thousand six hundred and thirty-five English yards.

And they further ordered, that the clerk should certify the decree to the surveyor-general of Florida, pursuant to law, with directions to survey and lay off the lands thus reserved to the United States, according to the lines, boundaries, and description thereof, in the decree.

From this decree, the present appeal to the Supreme Court was prosecuted by Colin Mitchel and others.

The case was argued by Mr. Ogden and Mr. Webster, for the appellants; and by Mr. Gilpin, Attorney General, for the United States. A printed argument, by the late Mr. Joseph M. White, for the appellants, was also submitted to the Court.

Mr. Ogden; after referring to the case of Colin Mitchel and others, in 9 Peters, 761, and reading the decree and mandate of the Court in that case; stated, that the question which was referred to the Superior Court of Middle Florida, was, what was the extent of the fort of St. Marks, and the ground around the same; to which under the decree and mandate of the Supreme Court, the United States were entitled?

It is contended that all the United States are entitled to is the ground covered by the fort St. Marks, and the ditch surrounding the same, if entitled to any land there. The whole territory was originally held by the Indians, whose grant to those under whom the appellants claimed, was the whole land, without any

reservation of the fort of St. Marks. No mention of the fort is made in the first grant. Afterwards the fort was recognised in the negotiations with the Indians; and this Court considered that a grant of the fort had been made by the Indians, or was reserved by the government of Spain out of the grant to John Forbes and Company.

The government of the United States are bound by the limits of the exception, as they claim under the exception.

It was under this view of the rights of the United States, and of the parties claiming under John Forbes and Company, that the decree of this Court proceeded. The Court of Florida was to ascertain the extent of the fort of St. Marks.

For this purpose the testimony of persons who were professionally acquainted with the subject under inquiry was taken. The evidence of Mr. Murat, and of Mr. Morris was procured. This evidence circumscribes and limits the right of the United States to the ground on which the fort is placed, and to the ground for the ditch around the fort. The adjacent and surrounding lands are not to be occupied by buildings, so as to prevent the full use of the cannon of the fort; but this does not give the right of property in the land so adjacent, to the sovereign or government holding the fort. For the purposes of cultivation, an ownership may exist in the lands about a fort, and does constantly exist. This is the law of Spain. It has been the practice of Spain to grant lands up to the Spanish forts standing upon them. This was the case at Pensacola and at New Orleans.

By the laws of Spain, houses cannot be built near the walls of forts, but if buildings a greater distance than three hundred paces from a fort are destroyed by the fort, they shall be paid for by the king. Recopelacion de las Indias. Madrid, 1755. Book 3, title 7, law 1.

The printed argument of Mr. White was as follows:

This is a part of the same controversy litigated between the same parties several years ago, and relates to that portion only of the case remanded for further investigation by the District Court.

The original sale by the aboriginal Indians, as a compensation for debts contracted, and indemnity for depredations committed upon the house of Forbes and Company, and the ratification of

the Spanish government, called for the St. Marks river as the eastern boundary of the cession and grant. This Court have decided that the sale and ratification constituted a full and absolute title in the house of Forbes and Company, which was regularly transferred by deed to the appellants, Colin Mitchel and others. There is therefore no question arising under these pleadings as to the legality of that sale and the confirmation of it. At the junction of the St. Marks and Wakulla rivers there was an old Spanish fortification, built of soft limestone and mud, as a defence of the Spanish garrison against the Indians. It does not enter into or form any part of the system of maritime defence projected by the United States engineers for the seaboard. The nature of the harbour, the small depth of water on the bar, and the impossibility of any armed vessel passing up to or above it, renders its abandonment for all military purposes unavoidable. The garrison has long since been removed, and its few rooms occupied as storehouses. It appears from some official correspondence in the large record that, in 1787, after the treaties between the Spanish Government and the Lower Creek and Tallapuchee Indians, some of the officers of his Catholic Majesty obtained the assent of the Indians to construct a fort. The title had been admitted by those treaties to be in the Indians; the government reserving only a pre-emptive right to the ultimate fee in the soil, and also the right of assenting to or rejecting any sales made by the Indians. No formal cession, transfer, deed, or treaty, is to be found in the archives. The assent of the Indians was probably obtained in council, in the same manner that the Spaniards obtained permission to erect a fortification at the Walnut Hills and Chickasaw Bluffs, on the Mississippi. However this may be, the fort, such as it is, was erected prior to the title given by the conjoint act of the Indians and Spanish government to Forbes and Company.

The only question, then, presented by this record is, whether there is in fact any and what reservation, either by Spanish law or usage, appurtenant to such a fortification, which annihilates or controls the title thus given.

The appellants show a sale and confirmation of the land without reservation, which, to all the remaining tract, has been admitted to be unimpeachable. This cession and ratification, in

the absence of all proof, upon well established principles of law recognised by the Court in numerous other cases, creates a presumption in favour of the appellants, and imposes upon the United States the onus probandi of showing whether any and what reservation was made. The United States, by their agents, has nowhere attempted to show that the laws of Spain created such a reservation as to control and destroy the grant. The only law produced by them proves incontestably that no such law existed. It appears that (by law 1, title 7, book 3 of the Recopelacion de las Indias) it was directed that the ground about fortresses should be unoccupied, and gave power to demolish buildings within three hundred paces, by "paying from our royal treasury to the owner the amount of the loss he may sustain." It follows from this law that the Spanish government recognised the ownership of lands to the walls of forts, with what might be called a servitude, by which the government could so far control individual property as to prevent the erection of buildings which might be prejudicial to defence. It is clear that this servitude can only exist as long as the fortification is occupied for the purposes of national defence. No proof has been made that any portion of land was ceded by the Indian proprietors for the construction of the fort. The presumption is, from the very imperfect information in the record, that if any were ceded it was the site only; and this is confirmed and strengthened by the fact, that the Indians sold the land without reservation to the house of Forbes and Company, and the Spanish authorities acquiesced in and ratified the sale to this land without reservation, which was approved by the Captain-General, the highest judicial and administrative functionary of the crown of Spain having jurisdiction over the Floridas. This concession and approval must be regarded as res adjudicata, so far as the rights of Spain are involved; and, as the United States only succeed to the rights of Spain by a cession of the vacant land, it follows that it is equally conclusive upon them.

This Court have directed that if the boundaries of the cession cannot be ascertained, "then the adjacent lands, considered and held by the Spanish government as annexed to a fortress for military purposes, shall be reserved." The United States hold the affirmative of the proposition, that there was by law or usage

such a reservation of soil, but they have utterly failed to prove it by any thing in this record. Can such a mere allegation, without proof, stand against an Indian sale for the land in question, recognised and approved by the Spanish government? It has been shown that the only law quoted or relied upon, gives to the government simply the right to demolish houses when they may be prejudicial to defence. (See White's Compilation, pages 36 and 92.) So far, therefore, as a question of law is involved, it is against the pretensions of the United States.

The next question is as to the military usage in Florida and the adjacent colonies. Upon this branch of the subject, the question is even clearer in favour of the appellants than upon the laws of Spain. Beginning at Pensacola, where there is the largest fortification in the two Floridas, commonly known as that of St. Carlos de Barancas, grants were made up to the walls of the fortification, and confirmed by the United States commissioners, whose reports were approved by an act of Congress. (See the claim of Don Fernando and Francisco Morino, whose title was confirmed and afterwards purchased by the United States for military purposes; see, also, the title of Don Vincento Pintado, No. 10, recognised and purchased by the United States for the same purpose.) This proves that the executive and legislative branches of the government have admitted, confirmed, and purchased of individuals such titles; and it will be seen by the act of Congress, as well as the decision of this Court in the case of Arredondo, that one of the rules of decision by the judiciary will be the extent to which the Legislature have gone in the admission of such titles; and it was further decided, in the case of Garcia and Lee, that the opinions of the executive upon the construction of treaties would be regarded by the Court as conclusive. This too was a case in which every member of the Court must have been satisfied, by the perusal of the documents, that if they had been at liberty to consider the question upon the proofs in the record, the United States had no just or legal title to the territory in dispute before the Florida treaty of 1819. But to proceed with the military usage. A fortification was erected upon the high grounds above Pensacola, called the fort of St. Michael, and regularly garrisoned up to the period of the negotiation of the Florida treaty. There were granted,

immediately adjacent to the fort, lands confirmed to William King, Rowland Clapp, Pawline Rivers, and others.

It appears also that various grants were made and confirmed adjacent to the fortification of St. Augustine, and that of Mobile, the site of which was also granted by the Spanish government. These concurrent acts of both governments, in regard to all the fortifications in the Floridas, are conclusive as to the military usage in the provinces. There was, neither by law nor custom, any other than a reserved right to the servitude, which ceased with the abandonment of the fortification. The title, therefore, of Forbes and Company, transmitted to Colin Mitchel and others, was as perfect as that to any other portion of the grant; with the single exception, that they could not build within the range of the shot, so as to be prejudicial to defence. There is nothing in the laws or usages of Spain to prevent their cultivation up to the walls.

It will be seen, also, that in all the other Spanish provinces, Forts Chartres, Kaskaskia, St. Louis, New Orleans, New Madrid, and Baton Rouge, similar grants were made, confirmed by commissioners, and ratified by Congress.

As the Indian sale, and Spanish ratification, run to the forks of the river, the appellants took the whole title absolutely, except at that point, and sub modo as to that. The abandonment of the fort must give them the same title which they had to other portions of the grant. The question appears to be too plain and obvious for further argument or illustration.

Mr. Gilpin, the Attorney General of the United States, contended:

1st. That the decree of the Supreme Court, at January term, 1835, ascertained, absolutely, the title and right of the United States to a tract of land embracing the fortress of St. Marks, and a certain extent of territory around it; that their title to the whole of this is as perfect and complete as that by which they hold any part of the public domain; and that the appellants had and have no right to any portion of it.

2d. That, for the purpose of ascertaining that extent of territory around the fortress, they directed the boundaries thereof should be determined by the Superior Court of Middle Florida, in the

manner prescribed by that decree; but that they conferred by their mandate no other authority on that Court.

3d. That the decree of that Court is warranted by law, and the facts proved; and is a complete and faithful execution of the mandate of the Supreme Court; and ought, therefore, to be affirmed.

Elaborate as have been many of the discussions, and anxiously contested as have been many of the cases that have received their final award from this Court, it may be doubted whether any one has surpassed, in these respects, that which is now to receive its conclusive decision. The vast extent of territory that has been involved, gives a magnitude to the controversy, before which the ordinary discussions about land titles dwindle into insignificance. It far exceeds, in extent, one of the sovereign states of this Union; and it equals, if it does not also exceed, another. It embraces within its limits a fertile land, and a climate of unsurpassed salubrity—the very spot where the cavaliers of Spain sought for the fountains of perpetual health. But, besides these, it has also fine rivers, a sea-coast, harbours, and islands, every thing that was wanting to constitute a princely domain.

The contest to secure it has been proportioned to its magnitude. Eight years of uninterrupted legal controversy brought it, at last, to this tribunal. Five of the present judges know the result. The great ability of the counsel; the laborious researches into the Spanish laws; the despatch of special agents by the government of the United States to Cuba; the thorough ransacking of the Spanish archives; the deferred and prolonged arguments; all presented the subject to this Court with a fulness and perfect acquaintance with law and fact that have no equal, perhaps, in its judicial history.

The opinion delivered at January term, 1835, shows the minuteness with which every point of the case was considered; and the decree is drawn up with a care and a determination to leave no point doubtful, which it might be thought would have been successful. It declared, 9 Peters, 761, the grant to the claimants to be valid; and that their title embraced the whole tract claimed by them, "except so much of the tract as included the fortress of St. Marks, and the territory directly and imme-

diately adjacent and appurtenant thereto;" and that, they expressly reserve, as being the property of the United States. To that they reject the claim of the petitioner; and decree that it is a part of the public lands of the United States. They then order their decree to be certified to the Superior Court of Middle Florida; and they direct that Court to have the two tracts surveyed, viz., 1. That decreed to the claimants; 2. That decreed to the United States. They direct that as to the first, the lines in the deeds of cession, from the Indians to the claimants, shall be followed. As to the second, they also direct that the lines of the cession to the Spanish government shall be followed, if they can be ascertained; but if not, then, in the first place, the boundaries of the lands held at that fortress, by the Spaniards, as annexed to it. If these cannot be ascertained, then the boundaries of so much land as, according to military usage, was generally attached to forts in Florida, or in the adjacent colonies, are to be taken. In default of proof of any of these, they decree to the United States, a tract extending from the point of junction of the St. Marks and Wakulla rivers, three miles up each river, and bounded by a straight line there drawn from one to the other.

It is this decree, which the Superior Court of Middle Florida has proceeded to execute. It has declared: 1st, That the lines of the Indian cession for the fortress cannot be ascertained. 2d, That the boundaries of the territory, held by the Spaniards, as annexed to it, cannot be ascertained. 3d. That the extent of territory held by military usage, in Florida, as annexed to a fortress, can be ascertained; and that it is, that within a line drawn at the distance of 1,500 Castilian varas, from the salient angles of the fortress.

The Court, therefore, directed the Surveyor General of Florida to lay off that boundary.

At this stage, the claimants interpose: declaring that this decree of the Court is wrong, that there is no military usage in Florida, which annexes any land to a fortress beyond its walls, and that if any land at St. Marks belonged to the United States, it was confined within a line running along the walls of the fortress; but that, in fact, they were entitled to no land there, whatever, as they had abandoned it as a fortress; and it was

contended that such ought to have been the decree of the Superior Court of Middle Florida, in obeying the mandate of this Court.

It is thus evident, that two questions present themselves: 1. What were the extent and meaning of that portion of the judgment of this Court, at January term, 1835, which was in favour of the United States? 2. Is the decree made by the Superior Court of Middle Florida a faithful execution of the mandate of this Court; or would its order have been truly performed by a decree such as the claimants required?

I. In proceeding to examine the first question, it is proper to advert to the principles by which we are to be guided, in considering how far an inferior Court has properly executed the mandate of the Court above. "To ascertain," say this Court in Ex parte Sibbald, 12 Peters, 493, "the true intention of the decree and mandate of this Court, the decree of the Court below, and of this Court, and the petitioner's title, must be taken into consideration." In the case of the Santa Maria, they say: "The proceedings in the original suit are always before the Court, so far as to determine any new points between the parties." 10 Wheaton, 431.

Adverting then to the original decree, and the proceedings on which it was founded, it is contended, on the part of the United States, that the Supreme Court ascertained absolutely the title and right of the United States, to a tract of land embracing the fortress, and a certain extent of land around it; that their title to the whole of this territory was as perfect and complete as that by which they hold any portion of the public domain; and that the claimants had and have no right whatever to any portion of it.

The original proceedings in the case, were instituted by the claimants, to recover the whole of the vast territory in question. They filed their petition under the sixth section of the act of the 23d of May, 1828. In that petition, they claimed to hold the entire one million two hundred thousand acres, under deeds from the Indians, confirmed by the Spanish authorities.

The United States, in reply, denied, first, that they had any valid title from the Indians and Spanish authorities, to any part of the land; but, secondly, if they had to a part, they had not

to that portion of it which embraced, and was appurtenant to the fortress of St. Marks.

The correctness of the first position, is not now a matter of discussion. The validity of the title of the claimants to the large body of land ceded to them by the Indians, was affirmed by this Court; and forms, at present, no subject of controversy. But as to the second, the right of the claimants to the fortress, and its appurtenant territory, the whole series of evidence adduced on the original trial, in the Superior Court of Middle Florida, is conclusive against them.

[The Attorney General then reviewed, in detail, all the facts connected with the privileges and cessions granted to Panton, and his successors, from the 3d of September, 1783, when the Floridas were retroceded to Spain, by England, until the 25th of August, 1825, when Forbes presented his petition to the Governor General of Cuba, for a certificate of the cessions. From this review, he regarded it, as clear, that the first title of the claimants to any portion of this land, was acquired only in 1806; that all which was then acquired lay on the west side of the Wakulla; that in 1811, they bought from the Indians such right only as they then had to the land between the Wakulla and St. Marks; that in 1825, when they made their application to the Governor General, they did not regard their own claim, derived under this last purchase, as embracing the fortress of St. Marks; and that the claim thereto was first set up in 1828.

The Attorney General then examined, in the same detail, the evidence adduced on the original trial, which proved the acquisition and establishment by the Spanish government, of a fortress at St. Marks, even before the transfer of Florida to England, in 1763; the early and express recognition by the Indians of their undisputed possession and sovereignty; the severance from the Indian domain, not only of the post itself, but of the quantity of land around, necessary for its protection, and the "circle of the jurisdiction of a fortified place;" the construction of the present military work, in 1787; the subsequent maintenance of it, at a great cost; and its distinct and special delivery to the United States, on the cession of the Floridas to them.]

Thus, then stood the case, on the evidence before the Superior Court of Middle Florida. A clear title in the government of

Spain, and derived from them to the United States, to this fort, and the circle of necessary jurisdiction, founded on conquest, direct grant, forty if not sixty years' possession, and legal prescription. A title in the claimants, admitted to commence less than ten years before the cession of Florida to the United States; in its terms excluding the fortress and its appurtenances; but, if it did not, being totally inconsistent with the previous right of the opposite party. Is it surprising that the judge, in alluding to the pretence, that the Indian grant to Forbes should cover this, spoke of it as " manifestly extravagant and unjustifiable?"

The decree of that Court, however, being adverse to the whole claim of Forbes, came entirely on the appeal, before the Supreme Court. But it does not appear that the claimants ventured, before this tribunal, to set up a title to this part of their original claim. On the contrary, the counsel for the claimants admitted, in his argument, that " the Indian title for the site of the fort of St. Marks, had been extinguished by a negotiation made by the Governor of West Florida." When, therefore, the Court came to pass on the validity of the claim, they scarcely adverted to the original pretension set up to this portion of the land, considering it as unequivocally abandoned. " As to the land," say they, 19 Peters, 733, " covered by the fort and appurtenances to some distance around it, it becomes unnecessary to inquire into the effect of the deeds, as the counsel for the petitioners have in open Court disclaimed any pretensions to it." The Court, however, were satisfied of the validity of the Indian grants, and of the title of the claimants, to all the land that they derived under them; as much as they were of the title of the United States to all that was held by the Spanish government. Their decree was, therefore, carefully made. It declared that the title of the petitioners to the land claimed, was valid and complete, except to so much of it " as includes the fortress of St. Marks, and the territory directly and immediately adjacent and appurtenant thereto;" and they declared that the claim of the petitioners to this latter tract " was rejected, and that the same is a part of the public lands of the United States." They then proceeded, 9 Peters, 763, to declare the mode in which their decree should be executed. They ordered the Surveyor General of Florida to survey and lay off the lands decreed, to belong to the petitioner, " excepting,

nevertheless, the part declared to be the territory of the United States." To fix the boundaries of this excepted territory, they ordered the Superior Court of Middle Florida to ascertain :

1. The territory which was ceded by the Indians to the crown of Spain, for the purpose of erecting the fort.

2. If the boundaries of this could not now be ascertained, then to ascertain the extent of the adjacent lands which were considered and held by the Spanish government or the commandant of the fort, as annexed to the fortress for military purposes.

3. If this could not be done, then to ascertain the extent of land generally attached to forts in Florida, or the adjacent colonies, according to military usage.

4. If this could not be done, then to extend a straight line across from the St. Marks to the Wakulla, at the distance of three miles above their point of junction, embracing within it the territory which was to be considered as adjacent and appurtenant to the fortress. Finally, they directed the Surveyor General to survey and lay off for the United States, the land thus declared to belong to them.

It will be seen, from the careful manner in which this decree was framed, that the Supreme Court left no question of title unsettled; that they explicitly decreed what belonged to the two parties who were claimants—what belonged to Forbes, and what belonged to the United States; that they absolutely and totally rejected the claims of the one party or the other to certain portions of the soil; that no title, perfect or imperfect; past, present, or future, was recognised as existing in either party to any other portion of the land in controversy, than that which was assigned to him by the decree. To Forbes was given all he claimed, except a tract previously granted to the Spanish crown. To that tract they declared he possessed no right whatever, perfect or imperfect; but that it belonged, in absolute title, to the United States. If its boundaries were known, the survey was to be made according to them. If its boundaries were unknown, they were then to be a line embracing all the territory that military usages or military purposes ever considered as appurtenant to a Spanish fort. The nature of the title was not left to depend on these usages; but merely the extent of boundary. The title was declared in terms to be absolute; wherever the boundary

was, the land was public land up to that boundary; the claim of Forbes, of every sort and to every inch of it, was absolutely rejected, as completely as if he had never held any grant whatever. The only reason for failing to direct the Surveyor General to lay off the boundary line of the tract decreed to the United States, was the ignorance of the Court on a single point of fact; and that fact they directed the Court below to ascertain.

This that Court has done. They have, by a formal judgment, declared that there is no evidence either of the boundary fixed by the Indians at the time of conveyance; or of that claimed by the Spanish government or commandant at St. Marks; but that it was a well settled military usage, to extend the appurtenances of a fort to the distance of fifteen hundred Castilian varas from its salient angles; and they decree therefore that the boundary of the territory of the United States shall be a line so drawn, between the rivers Wakulla and St. Marks.

It is from this decree, that the present appeal is taken. It is alleged to be erroneous, and this Court is called to set it aside. :

Two inquiries present themselves. 1. Is the fact found by the Court correct; and was it a well settled military usage to extend the appurtenance of a fort to a distance of fifteen hundred varas from its salient angle. 2. If so, was the decree of the Court, that the same should be surveyed as the boundary of the public land belonging to the United States, also correct.

I. By the law of Spain, as well as by that of most nations, (Merlin, Repertorie 2, 309, Fortifications,) a space is reserved around all fortified places; and by the established military usage of that country the reserved space around a fort certainly extended to fifteen hundred varas, or thirteen hundred and ninety English yards. In the Recopilacion, (b. 3, t. 7, l. 1,) it is declared that the ground about castles and fortresses shall be clear and unoccupied; and if a house be erected within three hundred paces, (which is equal to two hundred and eighty English yards,) it shall be demolished. In the same work, (b. 4, t. 7, l. 12,) no houses are to be built within three hundred paces of the walls of new towns. Similar to this is the evidence taken in the present case. At the instance of the claimants, the testimony of the director of engineers at Havanna was taken by order of Tacon, the Governor General. This officer states, that " when castles, forts,

or fortifications are established, a radius is determined from the salient angles of the covered way of fifteen hundred varas all around the fortification, in which space is prohibited the construction of dwellings." This is the opinion of a director of engineers in the Spanish army, as to the distance of the line from the fortress—the point of fact to be ascertained. Again, a concession of Governor White is produced, where a person applies for three acres of land at Macariz. The chief engineer reports them to be within fifteen hundred varas of the fort, and therefore a mere right of temporary cultivation was granted. There were several witnesses examined at the trial, who, although unacquainted with the military usage of Spain in particular, and differing as to the exact extent of ground thus reserved around forts, concur in a reservation being necessary, to an extent sufficient to permit the use of artillery. Colonel Achille Murat states that the distance kept free from permanent structures, on the glacis or esplanade of a fortress, is determined by a radius from the salient angles of the covered way of seventeen hundred toises, about three thousand four hundred yards. Colonel Gadsden says that he does not know the military usage of Spain on the subject, but that, when General Jackson took possession of the Spanish forts in Florida, he directed that the adjoining grounds should also be taken possession of, to the extent of point blank range of heavy ordnance; such being the usage of the Spanish government; he adds, that no fortress is defensible unless it has command of the ground around, to the extent of point blank range. Major Vinton says the point blank range of a thirty-two pounder is eight hundred and fifty yards. To complete the testimony on this point, we have that of Colonel Butler, who says expressly, that the woods had been cleared away by the authorities at St. Marks, to a distance of a mile and a half from its walls; and that of Mr. Crane, one of the claimant's witnesses, who says no buildings were erected outside of the fort before 1827, and then by permission of the United States. This point then is clearly established, that the extent of soil, for fifteen hundred varas from the fort, was appurtenant to it.

II. This fact being established, the remaining inquiry is, whether the Court erred in decreeing, that "the Surveyor General

should lay off the land up to this line, as being reserved to the United States, and forming part of the public lands."

This is the main point of the case, on the part of the appellants in their present proceeding. They deny that this part of the decree is right, upon two grounds, which were elaborately set forth in what are termed their petition and amended petition, filed in the Court below. The first of these grounds was taken on the 30th January, 1836, when, in the shape of a petition to the Court below, they asserted that they were the original proprietors of the soil as grantees of the Indians; and that, by the law of the Indies and the usage of Spain and her colonies, they possessed the absolute and useful dominion of it up to the walls of the fortress, and were only limited and restrained therein, so far as to be prevented from erecting any permanent buildings that might interfere with the defence of the place; and they therefore contended that the decree of the Court below should make the walls of the fort the boundary of their claim. The second ground was taken on the 14th February, 1838, when in what was called an amended petition, they asserted a still broader right; they alleged that the ground on which the fort itself stood, being originally granted by the Indians for the purposes of a fort alo. e, a mere use and occupancy passed to Spain for military purposes, leaving the fee in the Indians and their assignees; that such use or right of possession only passed to the United States; that they had abandoned the place as a military possession; that all their title thereto had ceased from such abandonment; and that the whole place, within the walls of the fort as well as without, now belongs absolutely to them as the grantees of the Indians. They therefore contended that the decree of the Court below should declare, that "the fee of the land covered by the fort" was vested in them.

To the grounds thus boldly taken, it is answered, that there are no such laws or Spanish usages as the appellants allege, which are applicable to this case; but that, on the contrary, they vest the absolute title in the United States, as far as the line ascertained by the Court; that if there were any such law or usage, it is controlled in this case by a prior and absolute grant from the Indians to the crown of Spain; that had it not been so expressly granted, it has been so held by an undisputed possession

of more than half a century; that, besides this, the right of the United States to the extent claimed by them, was solemnly admitted without qualification by the appellants; and that, if it were not so, the question now raised has been finally and irrevocably settled by the decree of this Court, and could not be mooted or acted upon by the Court below, as the appellants demand.

1. By the law and usages of Spain, where a fortress was erected in a country conquered from the Indians, the absolute dominion and title to the soil remained vested in the Spanish crown, not merely of the fortress itself, but of the land necessarily appurtenant thereto. This results directly and incontestibly from the whole system of Spain, in regard to countries discovered by her, or conquered from the Indians. Spain denied, absolutely, all right of the Indians to the conquered soil, except such as was allotted to them; to that only did she admit any right or title whatever. No nation ever framed so full and complete a system in regard to her discovered or conquered territory. 1 Robertson's America, 52. 102. 2 Rob. 208. 230. Note 69. The "Recopilacion de Leyes de los reynas de las Indias" contains this system in a digested and written form. It includes the Floridas, not merely by its general terms, but by its express language. B. 2, t. 15, l. 2; b. 5, t. 2, l. 1. 2 White's New Rec. 57. Every part of this work shows that the King of Spain claimed the absolute title in all lands within the American dominions, and did not recognise any right of the Indians, except in regard to such tracts as were expressly left in their possession. He asserted (b. 3, t. 1, l. 1; b. 4, t. 1, l. 1; b. 4, t. 2, l. 1; b. 4, t. 12, l. 14. 2 White's New Rec. 32. 48. 52) his absolute dominion to the soil of the Indies, by donation of the Holy See. Unlike the Anglo-Americans, Spain never made a single treaty to acquire the soil. Their own settlements, with lands for grazing and hunting, were left to the Indians. These they were permitted to alienate and devise, under certain regulations, as Spanish subjects were permitted to do, with lands granted to them; but if they occupied lands beyond this, or refused to relinquish those granted to the Spaniards, they were removed. B. 4, t. 7, l. 23. 2 White's New Rec. 48. 50. They were not permitted to change their settlement, or residence, without leave of the Spanish authorities. B. 6, t. 1, l. 27; t. 3,

l. 1. 13. 18, 19, 20.　In the treaty of 1784, with the Florida Indians, 10. Waite's Am. St. Pa. 123, which was made after the long war, and when it was most desirable to attach them to Spain, and dissolve their growing connexion with the English colonies, by means of the promise of certain commercial intercourse, they were yet expressly subjected to these Spanish laws; and, even as regards their own settlements, nothing was guarantied to them beyond their actual possessions, to the extent to which they were recognised by the laws of the Indies.　These doctrines—the right of absolute dominion, which conquest gives over an Indian territory—have been so often recognised by our Courts, that they are no longer open to discussion; and they have been applied as well to the American as to the Spanish intercourse with the original inhabitants of this continent.　As early as 1805, the executive department of our government, in its official correspondence, laid down these principles, 12 Waite Am. St. Pa. 311; and in the case of Johnson v. M'Intosh, 8 Wheat. 543, the whole question was elaborately argued and thoroughly examined in this, the highest branch of our judicial department. In delivering the opinion of the Court, the Chief Justice went at large into the subject.　He clearly showed that discovery was the original foundation of titles to land on the American continent, as between the different European nations, by whom conquests and settlements were made here; that the European governments asserted the exclusive right of granting the soil to individuals, subject only to the Indian right of occupancy, which those governments were exclusively to extinguish; that the same principle was recognised in the wars, negotiations, and treaties, between the different European powers; and that, since the Revolution, it had been adopted by the American states, the exclusive right of the British government, over lands occupied by the Indians, having passed to the governments of the states or of the Union, as the case may be.　The Supreme Court of New York, in the case of Jackson v. Goodel, 20 Johnson, 693, examined, after an elaborate discussion, the same general question, and, without any knowledge of the case pending in this Court, came to the same result.　So far, then, as the general question is concerned, in regard to the right of the government of a nation, by whom the conquest or discovery is made, to take possession

of Indian lands, we need look no farther to ascertain the principles which have governed, not only Spain, but other European nations, as well as ourselves. Even in the particular case out of which the present appeal arose, this Court, 9 Peters, 745, having reference especially to the rights of the Spanish crown in Florida, has declared, that, subject to a possessory right under which the Indians might enjoy their actual settlements, "the ultimate fee was in the crown and its grantees." If this view of the law, as applicable to the rights of sovereignty enjoyed by conquerors or discoverers, be correct, who can doubt that they might appropriate to their use the territory they desired for public works? To deny it would be in the face of every principle thus established; and it may well excite surprise, at this day, that the right, either of the British, the French, or the Spanish settlers of America, to hold land sufficient for a fortress, in the country they had acquired, should be questioned.

If a doubt could exist, it will be removed by examining the attempt made by the appellants to sustain their doctrine. After a search the most laborious, they rest it upon the opinions of two or three military officers, and a few grants in Florida and Louisiana, supposed to be somewhat analogous. The first of these opinions is not that of a Spanish lawyer, or a person acquainted with the public land system. It is from "a director of engineers," whose name even is not given. After describing the distance of fifteen hundred varas to be that which is attached to a fort, for military purposes, he says, "Within this it is prohibited to build houses, or rebuild those already in existence, but leaving the owners in full possession of their direct and useful domain of said lands; permitting only the construction of such edifices of wood as are necessary for their cultivation, and, of course, easily destroyed in case of a siege. This," he remarks, "is done for the purpose of showing due respect to the sacred rights of property, and to save the government from the immense expense that would otherwise be necessary for the indemnification of the proprietors whose lands were thus taken." He then concludes by saying, "From what he has exposed, and from the evidence under his eye, it results that St. Marks has not occupied, and ought not to occupy, more than the land within the line of the ditch." Now, of this opinion, beyond the part which gives the

distance of the line of reservation according to military usage, it may be remarked, that it is entirely gratuitous—no opinion on any other point was asked.   But is it surprising that it should have been thus volunteered by an ex parte and anonymous witness, when it was evidently introduced to his notice as an important part of the claimant's case ?   The evidence on which he founded it was, as he remarks, under his eye; that evidence could only be such as related to the claimant's title; it could not come officially before the "director of engineers;" it could only be brought by them specially to his notice.

But admitting the "exposition," though not the "result" of the "director of engineers," yet it does not establish a position it is necessary to deny.   It establishes only this, that a resulting fee, or a right to the usufruct of the soil, in and around forts, existed when, on the establishment of a fortress, the existing title of the owners, for purposes of economy, was only partially condemned, or a partial use not interfering with that for which it was taken, was allowed; or when, after the establishment of a fortress, qualified grants were made around it, which became strengthened by a proscription that, on the abandonment of the fortress, grew into an absolute right.   Admit these principles, and in what respect do they sustain the ground that the government cannot take the absolute property; much more, it may be asked, how can they be construed to prevail against the absolute right to the soil and domain acquired by conquest, and always explicitly declared ? In no case could this latent and resulting interest exist without the agreement of the crown ; and in the case of a fortress built on Indian land, the idea of such an agreement is preposterous. These views are applicable to every case cited in the record, of grants made up to the walls of fortresses.   The case of Labatut was one where, after the fortification was erected, lands were taken from a person to whom they had been granted, on some change in the works.   The cases of confirmed claims are the same ; no one can doubt but that the government might, if it saw fit, grant lands under conditions more or less rigid, in such situations.   The present case has no principle in common with these.

If it be said that the right of the king was limited to the fort, and did not extend to the appurtenances, the answer is that he

would not take and occupy less than was necessary tor the purposes contemplated; his right was the same to one as the other; excl ding the Indians from it, all would be set apart that the public service required. It is shown to be as necessary to the fort as the land within the walls; it is an appurtenance, which, in a general grant, would pass with it.

2. But had there been such a law or usage existing in any territory, acquired by Spain from the Indians, it would not avail the claimants in this case, because the Indians, under whom they claim, recognized the absolute title of the Spanish government at least five-and-twenty years before the purchase from which the claimants derive their title. This has been already adverted to. It is apparent, in the evidence of Governor Folch, on whose confirmation of their title the claimants depend. His e idence is adduced by themselves. He says, that in 1787 " all the lands necessary for the establishment of the fort" were reserved in the presence of the Indians, " with great ceremony." Calderon, an officer there at the time, says that the quantity of land needed to preserve the fort, and all within "the circle of jurisdiction of a fortified place, was taken." Evidence stronger than this, from the lips of the witnesses of the claimants could not be adduced, to establish the nature and extent of the Spanish title. This is corroborated by the terms of the second deed of the Indians, which includes the land between the Wakulla and St. Marks, where they speak of the grant as conveying " all the right" they had "retained in the land to that time."

3. The governments of Spain and of the United States have had uniform and uninterrupted possession for at least fifty years, probably for seventy. This is in direct proof, in the evidence of Caro, Calderon and Doyle, agents of the Spanish government and of the claimants, as to the period from 1787 to 1821. It was taken possession of in 1821 by General Jackson, for the United States, in pursuance of the second article of the treaty with Spain; which expressly and separately cedes " all public edifices, fortifications, barracks, and other buildings which are not private property." The possession thus taken, extended, at the time, to the territory around the fort, as well as within the walls. The forest was cleared away from the earliest times; no building, however trifling, was erected there till 1827; General

Jackson took possession as far as the point blank range of a thirty-two pounder. Under the well recognised Spanish law, this possession would give a prescriptive title. That title, by the Spanish law, was absolutely vested and accrued long before the Indian deed to Forbes. Institutes of Azo, 4. 2. 21. 1 White's New Rec. 347.

4. But supposing that the title of the United States, thus derived, were not perfectly clear, it is made so by the express and explicit disclaimer of the appellants to this fortress and its appurtenances. This disclaimer was distinctly made, in argument, in this Court, by their counsel. It was so understood by the Court, and so stands recorded in their opinion. In that opinion (9 Peters, 733) it is said: " As to the land covered by the fort, and the appurtenances to some distance around it, it becomes unnecessary to inquire into the effect of the deed, as the counsel of the petitioners have in open Court disclaimed any pretensions to it." It might be thought that a relinquishment of even a pretension to this land, so explicit, would have precluded the present claim. Far from this, however, the appellants now seek to disclaim their disclaimer. They seek to represent it as a sacrifice of part to secure the residue; as a compromise. But it was no compromise. How could they compromise with this Court? It was an admission of a fact that could not be denied; and one which, if persisted in, would have injuriously affected their entire claim. Throughout the whole proceedings in that case there is not a "pretension" set up to the land now in controversy; and the evidence which shows its fallacy, if any were wanting, proceeds, uncontradicted and unexplained, from their own witnesses.

5. Supposing, however, all these views to be erroneous; and supposing this Court does not sustain the correctness of one of these positions; does this afford ground for setting aside this decree? It does not. If the judgment of the Court were wrong in assigning to the United States this property as "public land," that is an error of the Supreme Court: the Court below could not inquire into it: it could not grant any part of the prayer of the petitioners: it had the limited duty to perform of executing the decree of the Court, not of examining questions connected with the merits of that decree. It is an answer to

G 2

every ground of objection to say, that it is one with which the Court below had nothing to do. Ex parte Sibbald, 12 Peters, 492. The decision of the Supreme Court in 1835, was final on every point now sought to be raised, in regard to the title to the fort of St. Marks and its appurtenances. The sole question, then left open, was the extent of those appurtenances. By what authority could the Court below have decided, as the claimants require, that there was no land appurtenant to the fort; when the Supreme Court had expressly said, that the "territory adjacent and appurtenant to the fortress is reserved for the use of the United States?" By what authority could the Court below have declared that the fort and its appurtenances had been abandoned by the United States, and had reverted to the claimants; when the Supreme Court, after having before it the same evidence of abandonment which the Court below had, declared that, so far from reverting to the claimants, it was still a part of "the public land" of the United States? The object of the Supreme Court, in remitting the proceedings to the Court below, was merely to carry into effect its decree; and to inquire into a single fact necessary to the proper execution of that decree. It was not to review what the Supreme Court had done; to examine rights already examined by this tribunal; to ascertain facts already set forth in the record they had before them; to decide upon conflicting and intricate questions of title. Had the Court below done any of these things, as the appellants demanded it should do, then indeed it would have erred. The duty of a Court below, to whom a decree of this Court is sent, is limited solely to the duty of executing that decree.

It is submitted, therefore, that unless it has been shown (as it certainly has not) that a distance of fifteen hundred varas is incorrectly stated to be the extent of the appurtenances of a Spanish fort; then the decree of the Court below, directing the Surveyor General to lay off the land to that extent, was correct; and there is no ground for this appeal.

Mr. Webster, for the appellants.

The writers on public law declare that the range of a cannon shot from a fort shall be the territory appurtenant to a fort, so as to prevent the erection of buildings, or any obstacles to the

uses of the fort. The Court below, were therefore wrong, when they gave the right to the soil within the range of a cannon shot; unless the mandate of this Court gave to the United States the right to the soil, instead of the ordinary uses of it, connected with the fortification; the eminent domain of the United States was in the land on which the fort was placed; this was essential to the property in the fort, but no more than this; and the Court did not intend to go any further than to secure to the United States the full use of the fort of St. Marks. Why should the Court give a right to the soil of the surrounding land, when the servitude of it was all that is necessary; and it is all that in similar cases has been claimed and used by the Spanish government, and all that the government of the United States have required?

It is contended, that the whole object of the decree was to have ascertained what was necessary for the common and convenient use of the fort. The Court, in the first instance, intended to secure the fort to the United States; other than the right of soil in the fort, the Court did not propose to determine. The construction now contended for by the Attorney General, would give to the United States jurisdiction over all lands around a fort, within the range of a cannon shot, near the forts of the United States. Thus, the cities of New York, of Philadelphia, and Baltimore, would be under the jurisdiction of the United States. This has not been the understanding or practice. Jurisdiction over the forts has only been exercised, or asserted.

The mandate to the Superior Court of Middle Florida, directed that Court, in the first place, if there had been any grant from the Indians, or any proceeding of the Spanish govenment, which definitely and accurately fixed the extent of the fort, and of the reservation of the adjacent ground, to ascertain and determine the same. No grant, and no such proceedings were found.

It was authorized, secondly, to ascertain the extent of the use of the ground round the fort, by the Spanish authorities. This could have been ascertained: evidence to this, was taken by the order of the Court, and it is abundant on the record. That evidence fully sustains the claim of the appellants; and the Court should have decided the boundaries of Fort St. Marks, and the extent of "adjacent lands, which were considered held by the Spanish government, or the commandant of the fort,

as annexed to the fortress for military purposes," according to that evidence.

When the Spanish government confirmed the grant to John Forbes and Company, no reservation was made of Fort St. Marks. This is conclusive on the United States, and should induce this Court to decide this case in favour of the appellants. The evidence of the commandant of the fort, while it was under the Spanish government, is, that the land belonged to John Forbes and Company.

What are the laws of nations on this subject. Cited, Burlemaqui, part 3, sect. 25—29. Puffendorf, b. 8, ch. 5, sect. 7.

The true position of this case is this: When the confirmation was made of the Indian grant, no reservation of the fort was made, and the appellants stand on the original grant; and the grantees having acquired the whole of the land, they rest on their rights thus acquired. It is admitted that after the grant by the Indians, Spain had a right to establish on the lands, and did establish, the fort of St. Marks, on the same. Spain is, therefore, bound to show the extent of her invasion of the land of the grantees of the Indians; and now, the United States, having come in under Spain, is bound to the same.

The reference to the Superior Court of Florida, by the Supreme Court, did not impose on that Court the duty of ascertaining to whom the land circumjacent to the fort belonged. The command was to determine how much adjacent land was required for the use of the fort. As has been said, the use of the ground around the fortress was all that was required for the fortress; and this did not necessarily carry with it the right in the soil.

Mr. Justice WAYNE delivered the opinion of the Court.

This case arises upon the mandate of this Court on the case of Colin Mitchel and others *v.* The United States, reported in 9 Peters, 711.

In that case, it will be seen, that the lands claimed by the plaintiffs were in different tracts, and that this Court, in confirming the title of the plaintiffs, excepted from one of them the fortress of St. Marks, and "the territory directly and immediately adjacent and appurtenant thereto," which were reserved for the United States. The Court further decreed, that the territory

thus described, shall be that which was ceded by the Indian pro-prietors to the crown of Spain, for the purpose of erecting the said fort: provided the boundaries of said cession can be as-certained.  If the boundaries of the said cession cannot now be ascertained, then the adjacent lands, which were considered and held by the Spanish government, or the commandant of the post, as annexed to the fortress, for military purposes, shall be still considered as annexed and reserved with it, for the use of the United States.  If no evidence can be obtained to designate the extent of the adjacent lands, which were considered as an-nexed to St. Marks, as aforesaid, then so much land shall be comprehended in this exception, as, according to military usage, was attached generally to forts in Florida, or the adjacent colo-nies.  If no such military usage can be proved, then it is or-dered and decreed, that a line shall be extended from the point of junction between the rivers St. Marks and Wakulla, to the middle of the river St. Marks, below the junction, thence ex-tending up the middle of each river, three miles in a direct line, without computing the courses thereof; and that the territory comprehended within a direct line, to be run so as to connect the points of termination on each river, at the end of the said three miles up each river; and the two lines to be run as aforesaid, shall be, and the same are hereby declared to be the territory reserved, "as adjacent and appurtenant to the fortress of St. Marks;" and as such reserved for the use of the United States. To which, the claim of the petitioner is rejected; and as to which, this Court decree, that "the same is a part of the public lands of the United States."

The Court then reverses the decree of the Court below, de-claring it to be reversed and annulled in all matters therein con-tained, with the exception aforesaid; and proceeding to render such decree as the Court below ought to have rendered, decreed the claim of the petitioners valid, to all the land claimed, except to such part as it had excepted.  The clerk of this Court is di-rected to certify its decree to the Surveyor General of Florida, with directions to survey and lay off the lands described in the petition of the claimant, according to the lines, boundaries, and description thereof in the several deeds of cession, grant, and confirmation by the Indians or Governor of West Florida, filed

as exhibits in the cause, or referred to in the record thereof; excepting, nevertheless, such part of the tract granted in 1811, lying east of the tract granted in 1804 and 1806, as is hereby declared to be the territory of the United States, pursuant to the exception hereinbefore mentioned, and to make return thereof, according to law, as to all the lands comprehended in the three first herein mentioned tracts; and as to the tract last mentioned, to survey, and in like manner to lay off the same, as soon as the extent of the land excepted and reserved for the use of the United States shall be ascertained in the manner directed. And the Court directs that the land excepted and reserved, shall be ascertained and determined by the Superior Court of the middle district of Florida, in such manner and by such process as is prescribed by the acts of Congress, relating to the claims of lands in Florida; the Court rendering thereupon such judgment or decree as to law shall appertain.

This mandate was filed by the plaintiffs in the Superior Court of Middle Florida. They afterwards filed a bill, claiming from the Court a confirmation of their title to the land excepted, up to the walls of the fort of St. Marks; assert this claim, upon the ground of the laws, usages, and military practice, in the various colonies of Spain; and then, in an amended bill, they ask the Court to decree to them, the fee in the land covered by the fort, as well as that adjoining and appurtenant, because they say the land on which the fort is erected was originally obtained from the Indians, for the purpose of erecting a fortification, to be occupied and used as such, for that express purpose and no other. The attorney of the United States filed exceptions and an answer to the bills of the plaintiffs, alleging, among other things, that all the points in dispute between the United States and the plaintiffs, concerning the land they claimed, had been settled by the decision and mandate in the original case; and that the only object of this Court, in referring the mandate to the Court below, was, that it might ascertain the extent and boundaries of the tract of land which includes the fortress of St. Marks, and the territory adjacent; to which the claim of the petitioner had been rejected, and which had been reserved for the use of the United States.

On these pleadings, and the evidence taken in it, the cause was tried. The Court expresses the opinion, that the boundaries

of the territory ceded by the Indians to Spain, for the purpose of erecting the fortress of St. Marks, cannot now be ascertained; that no evidence can now be obtained to designate the extent of the adjacent lands which were considered as annexed to the fort, by the crown of Spain, or the commandant of the post; but declares there is sufficient evidence of the military usage of Spain, to determine the extent of land adjacent to forts in Florida;, which were usually attached to said forts. The Court proceeds to say the extent of such reservations was determined by a radius of fifteen hundred Castilian varas, from the salient angles of the covered way all round the works; or, there being no covered way, from the salient angles of the exterior line of the ditch. A decree is made by the Court, conformably with this opinion, from which the plaintiffs appeal.

It is urged for the appellants, that as the sale from the Indians to Forbes and Company calls for the St. Marks river as the eastern boundary of the cession and grant; and as the title to the land was in the Indians, with only a pre-emptive right to the ultimate fee in the soil in the King of Spain, with the additional right of assenting to, or rejecting sales, by the Indians; that if no formal cession, or transfer of the land, upon which the fort is erected, can be found from the Indians to Spain, before the sale to Forbes and Company, confirmed, as it was, by the authorities of Spain, without any exception of the site of the fort or land appurtenant to it, that the adjacent land up to the walls of the fort belongs to the claimants, and the site of the fort also, in the event of its abandonment as a fortification; that the right to the site would have been consummated in the claimants, in virtue of the sale by the Indians, if it had been disused as a fortress by Spain before Florida was ceded to the United States; and that the latter could only hold it for the same use, or as Spain held it; and now having been discontinued by the United States as a fortress, that the claimants were entitled to it in fee. It was also said, that the Spanish government recognised by its laws the ownership of lands to the walls of forts; and that military usage, in Florida, and the adjacent colonies, permitted it.

The case before us does not require any discussion upon the nature and extent of the property held by the Florida Indians in these lands under Spain. That was satisfactorily done in the

decision given by this Court in the original case, 9 Peters. It was then shown, that the Indians "held under Great Britain and Spain, a right of property in these lands, which could not be impaired, without a violation of the laws of both, and the sanctity of repeated treaties." 9 Peters, 756. "That Spain did not consider the Indian right to be that of mere occupancy and perpetual possession, but a right of property in the lands they held under the guaranty of treaties; which were so highly respected, that in the establishment of a military post by a royal order, the site thereof was either purchased from the Indians, or occupied with their permission, as that of St. Marks." 9 Peters, 752.

These extracts present the claim of the appellants under their Indian title, and confirmation of it by Spain, in its strongest light. The last of them is particularly applicable to the point in controversy.

It is then to be determined whether the Court below, in its judgment, has rightly apprehended and executed the mandate of this Court.

The meaning of the mandate may be ascertained from the instrument itself; but the reasons which induced the Court to make it, are to be found in the evidence contained in the original record. The Court will now do what it did in the case of Sibbald, 12 Peters, 493. It said, "To ascertain the true intention of the decree and mandate of this Court, the decree of the Court below, and of this Court, and the petitioners' title, must be taken into consideration." In 10 Wheat. 431, this Court says, "The proceedings in the original suit are always before the Court, so far as to determine any new points between the parties."

From the evidence then adduced by the claimants in the original case, it appeared that when the Floridas were retroceded to Spain, by England, September, 1793, that Panton, an English merchant, resided at St. Augustine, and traded with the Indians in East Florida. Rec. 114. In 1784, Governor Mero, finding it necessary to cultivate trade with the Indians, gave permission to one Mather to bring two vessels from London, direct to Pensacola and Mobile, laden with goods of British manufacture, to supply the Indians. In July, 1784, Panton applied to Governor Zespedes for leave to remain in the province, with permission to

import from Great Britain such articles as the Indian trade required, and to export peltries received in payment. Rec. 157. A royal order was passed on the 8th May, 1786, (Rec. 160,) allowing Panton and his partners to remain in Florida, on their taking the oath of alliegance, and permitting them to trade with the Indians. They were allowed to send a ship, annually, to Pensacola, with British goods, and to take back peltries. Rec. 118. In 1787 or 1788, (Rec. 162. 304,) they were allowed to erect a storehouse on the river St. Marks, to collect their peltries; and the vessel from Pensacola was permitted to go there to load them. In 1789, Panton was intrusted with the exclusive trade, (Rec. 118. 250;) and in 1791, received a special royal license. The year after, an attack was made by the Indians, under Bowles, on Panton's store, on the river St. Marks, and much property taken away. The same kind of outrage was repeated in 1800, with heavy loss to Panton and his associates. The Indians also owed them a large sum for goods. Forbes succeeded Panton in the trade which the latter began with the Indians, and was the assignee of his claims upon the Indians. In January, 1801, (Rec. 56,) he informs the Marquis Casa Calvo, that he had been negotiating with the Indians to cede lands in payment of the debt, and in satisfaction for the outrages committed by them on the store at St. Marks. The Governor countenanced the negotiation. In 1804, Inverarity, an agent of Forbes, informed Governor Folch that the Indians had agreed to sell the land, and asks his consent to complete the purchase. The consent was given. On the 25th May, a deed was made, and in August, in a full Indian council, held at St. Marks, the Governor being present, the sale was ratified. This was Forbes's first purchase. It embraced the land between the Appalachicola and Wakulla, extending several miles up the rivers. The boundaries of this first purchase were run and fixed by the Indians, in 1806. All the surveys being completed within that year, Governor Folch confirmed the grant, and gave the grantees possession. Rec. 618. 622. 74. In January, 1811, a new negotiation was made with the Indians, and they agreed to sell additional strips of land on the western, northern, and eastern sides of the first purchase; but the cession was of "all the right the Indians had retained in the land until that time." The eastern addition embraced

VOL. XV.—H

the land from the Wakulla to the St. Marks, and down the latter to the sea; thus including the point between the two rivers. This second cession was also confirmed by Governor Folch, in June, 1811. Thus matters stood, the cession being known as Forbes's land; and the fort of St. Marks continuing to be garrisoned by Spain until it was surrendered to the United States, under the treaty. The history of the grants to the claimants having been traced, it is here necessary to give that of the fortress of St. Marks, as it is to be collected from the evidence in the original case.

In the record, 123, a despatch from the Marquis of Casa Calvo shows that during the possession of Florida by the English, the fort of St. Marks had been a military post; though it had been abandoned, and suffered to go to decay. Shortly after its retrocession to Spain, the latter extended the jurisdiction of West Florida, so as to include the site of the fort. Rec. 189. In May, 1785, Count Galvas issued an order to repair the old fort at St. Marks, and a detachment of troops was ordered to it from Pensacola. Rec. 306. This detachment was cut off, or driven away by the Indians. Rec. 582. But in the spring of 1787, (Rec. 198. 306,) a royal order was issued, directing the permanent establishment of the fort. "It is notorious and public," (Rec. 233,) says Governor Folch, the principal witness of the claimants, and the person who gave them possession of their whole purchase, "that at the establishment of the fort of St. Marks, at Appalachia in the year 1787, all the solemnity and requisites were observed to obtain from the Indians in sale, the lands necessary to that object." Benigno de Calderon, who was then an officer of the Spanish government, twice refers to the fact, that not merely a military post itself, "but the quantity of land needed to preserve it;" and what he calls "the circle of jurisdiction of a fortified place;" was severed from the Indian land, and vested in the government of Spain. Rec. 570. 582.

Immediately after the sale of which Governor Folch speaks, the fort was constructed by Spain, at a heavy expense. So were the public stores. The evidence of the claimants shows at least two hundred thousand dollars were expended upon these works. Calderon says there was a regular Spanish garrison there from 1787 to 1818. Caro says the Governor exercised

both civil and military jurisdiction.    When Florida was ceded to the United States, St. Marks was given up as a military fortress of the King of Spain.    Such is the history of the fortress of St. Marks, taken from the testimony and the witnesses of the claimants in the original case.    Is it surprising then, that the Court in its mandate should have excepted the fort and land directly adjacent to it from its confirmation of the claimant's title to the lands bought by them from the Indians?    The king's royal order to establish a fort at St. Marks, the occupancy of the fortress for more than twenty years before any grant was made to Forbes, twenty-five years before the grant was made, which includes it, and forty years occupation of it with the use of the land adjacent; seemed to the Court to be inconsistent with the idea that it was intended to be included in the sale by the Indians, or by the confirmation of that sale by Governor Folch.    It must be remembered, also, that when Governor Folch gave possession of the land to the grantees, that the fort was retained, and that the land, to the extent at least of what is termed the circle of military jurisdiction had been cleared; and that the grantees, though living by permission for protection of themselves and their trade, within that circle, never exercised by cultivation or otherwise any acts of ownership over any part of it.    Besides, the Court was advised, when the decision in the original case was made, that by the laws of the Indies, reservations of lands were made appurtenant to forts, though the extent of such reservations was not known.    It was then, however, a subject of inquiry, and would no doubt have been fully investigated; if the counsel for the claimant had not admitted in his argument, that the Indian title for the sale of the fort of St. Marks, had been extinguished by a negotiation made by the Governor of West Florida.    In the opinion of the Court, given by Mr. Justice Baldwin, is found the following paragraph :    " It is objected that the grant of 1811 is invalid, because it comprehends the fort of St. Marks, then actually occupied by the troops of the king.    It is in full proof that the site of St. Marks and the adjacent country was within the territory claimed by the Seminole Indians.    Rec. 12. 131. 603—607. 618.    It is not certain, from the evidence, whether it was purchased from the Indians, or merely occupied by their permission ; there seems to be no written evi-

dence of the purchase, but.no witness asserts that possession was taken adversely to the Indian claim, and it is clearly proved to have been amicably done. Rec. 232. 306. 581. Whether the Indians had a right to grant this particular spot then or not, cannot affect the validity of the deeds to the residue of the lands conveyed in 1811. The grant is good so far as it interfered with no prior right of the crown, according to the principles settled by this Court, in numerous cases, arising on grants by North Carolina and Georgia, extending partly over the Indian boundary, which have uniformly been held good, as to whatever land was within the line established · between the state and the Indian territory. Wear. *v.* Danforth, 9 Wheat. 673. Patterson *v.* Jenckes, 2 Pet. 216; and Winn and Patterson, decided by the Supreme Court of the United States. As to the land covered by the fort and appurtenances, to some distance around it, it became unnecessary to inquire into the effect of the deeds, as the counsel of the petitioners have in open Court disclaimed any pretensions to it." It is not, however, upon this disclaimer of the claimants' counsel, that the Court relies to sustain the judgment of the Court below upon the mandate. It is cited only to them to show that the subject.matter of the present·controversy was· considered by the Court. That the Court, not knowing at that time what should be the reservation appurtenant to the fort of St. Marks, directed it to be ascertained, and excepted it absolutely from the grant of the claimants; declaring it to be a part of the public lands of the United States. The object of the Court, was to put these claimants in respect to the lands which they claimed, in the condition they would have been, if Florida had not been ceded to the United States. It was the intention of the Court, in the language of, the treaty, to put them in possession of the lands, to the same extent that the same grants would be valid, if the territories had remained under the dominion of his Catholic Majesty. Can it be supposed for a moment, when the king, by his royal order, directed the Intendant General of Cuba, to inquire into the subject of the indemnity. which should be made to the house of Panton, Leslie, and Company, for services to the crown and for Indian depredations, that he would have sanctioned, or that the Intendant General would have ventured to propose a cession of land, including public stores and a fortress,

which had been built at a great expense, at an important point on the coast, which was essential to control and keep the Indians in subjection, and all-important to resist external attack.

Does any one believe, when Governor Folch sanctioned the purchases, confirmed and gave possession of the lands to Forbes and Company, that he would have done either, if he had thought he was giving to them a title to the fort of St. Marks, and its circle of military jurisdiction, against the king; or that the Captain General of Cuba, to whom Governor Folch reported his proceedings in this matter, would have approved and declared that the king would confirm them; if he had supposed that he was permitting the Indians to sell a fortress, then garrisoned by the troops of Spain, and which had been so for more than twenty years? Is it not certain nothing of the kind was intended, when it is remembered that Governor Folch, who superintended the sale of the land, marked out its boundaries, and gave possession of it to the original grantees, says: "It is notorious and public, that at the establishment of the fort of St. Marks, at Appalachia, in the year 1787, all the solemnities and requisites were observed, to obtain from the Indians in sale, the lands necessary to that object?"

We will not enter into the question, how far the appropriation of the land for a fortress, by order of the government, extinguished the Indian title. It might be done successfully, upon the positions taken by this Court in respect to the rights of European monarchs to Indian lands in North America, in Johnson and M'Intosh, 8 Wheat. We are inclined to put this case upon facts disclosed by the claimants' evidence in the former cause, and the inferences and arguments which may be drawn from them, because the Court did not do so, in its decision, in consequence of the admission of counsel, "that the land covered by the fort and appurtenances, to some distance around it," were not contended for.

In addition to what has been said, however, in respect to St. Marks, and the appurtenant land, not being within the grant from the Indians to the claimants, we remark, that the subject may be satisfactorily disposed of, by a reference to the second article of the treaty with Spain. "His Catholic Majesty cedes to the United States, in full property and sovereignty, all the ter-

ritories which belong to him, situated to the eastward of the
Mississippi, known by the name of East and West Florida; the
adjacent islands dependent on said provinces; all public lots, and
squares, vacant lands, public edifices, fortifications, barracks, and
other buildings, which are not private property." In the con-
struction of this article, it will be admitted, that the last member
of the sentence cannot refer to any of the enumerated cessions,
notorious as public property, or that it must be confined to the
terms, "other buildings in connexion with it." The treaty then
secures to the United States the fort of St. Marks, and so much
land appurtenant to it as, according to military usage, was attached
generally to forts in Florida, or the adjacent colonies. Was there
any such usage, and has it been established by sufficient testi-
mony to sustain the judgment of the Court below? We think
there was, and that the proofs are sufficient. At the instance of
the claimants, the testimony of the director of engineers was
taken by order of the Governor General Tacon. His evidence on
the record before us, is that, "a radius of 1,500 Castilian varas, is
measured from the salient angles of the covered way, all around
the fortification." That such was the rule, is confirmed by a docu-
ment introduced by the claimants, as evidence in this case.
In 1801 a petition was presented to Governor White, for a grant
of land at Macariz. He referred it to the chief engineer. The
engineer reported it to be within one thousand five hundred
yards of the castle, "that it cannot be cultivated in corn, nor
can ditches, or thorn fences be allowed; that plants of a low
growth, and vegetables may be permitted to be cultivated, and
it may be allowed for the security of the produce to erect simple
post and rail fences, which may be sufficient to prevent animals
from breaking in." Under these restrictions, it was granted; so
that it could only be used in such a way, as could not interfere
with the defensive and offensive power of the castle. Several
witnesses were examined on this point: all of them concur in
saying a fortress cannot be defended, unless it has the command
of the ground around it, to a considerable extent. Colonel
Murat gives as the usage of the European armies, that from the
salient angles of the covered way, a radius of three thousand,
four hundred yards is marked, in which it is not permitted to
erect any permanent buildings, or embankment, or stone fences, or

ditches.   We know it, also, to be the usage of all civilized nations, to assert such rights over the ground adjacent to fortifications, in a time of war.   It is reasonable, then, to conclude, that European monarchs, in the construction of permanent fortifications, in the new world, upon Indian lands before it had been granted by the sovereign, or permitted to be alienated by the. Indian, intended to appropriate so much of the land adjacent to a fortification as was necessary to defend it.   That it was so intended in the instance of St. Marks, is strongly corroborated by the testimony of Col. Butler, who says the woods had been cleared away by the authorities at St. Marks, to the distance of a mile and a half from the walls.   Another witness says, no buildings were erected outside of the fort, before 1827, and then, by permission of the United States.   It is hard to resist the conclusion, that such a clearing before the sale by the Indians, without the cultivation or occupancy of any part of it, by the grantees, from the time of the Indian sale, to the surrender of the fort to the United States, does not indicate an intention upon the part of the authorities of Spain, to reserve some land adjacent to the fort for military purposes; and the acquiescence of the purchasers, that though within the boundaries of the grant, the fort and land attached to it by military usage was not intended to be conveyed. Nor can we admit, as it was argued by the counsel of the appellants, that the instances cited in the record of grants of land, up to the walls of fortifications, by the Spanish authorities in Florida and Louisiana, disprove the existence of a military usage to reserve land adjacent to forts in them.   Those instances are exceptions out of the military laws of Spain, as contained in the royal ordinances; which declare that "a radius of one thousand, five hundred varas is measured from the salient angles of the covered way."   We do not think it necessary to remark further upon the opinion given by the chief engineer, in respect to the manner in which such titles were acquired to land adjacent to fortifications, or the extent of the military jurisdiction over them, than to observe the fact of certain reservation being declared by him, as a fact; we require something more than his conclusion or inference, that there was no reservation according to the military usage and ordinances of Spain, in the instance of St. Marks.

Our opinion is, that the Court below has fully apprehended and executed the judgment of this Court; and its judgment is accordingly affirmed.

This case came on to be heard, on the transcript of the record from the Superior Court of the middle district of Florida, and was argued by counsel. On consideration whereof, it is ordered and decreed by this Court, that the decree of the said Superior Court in this cause be, and the same is hereby, affirmed.